LITTLE
ROCK.
Jan'y 1839     1   513
               13  590
THE STATE      25  251
    vs.         1   513
ASHLEY        j78  455
& OTHERS       82  587

THE STATE *against* CHESTER ASHLEY AND OTHERS.

## Writ of Quo Warranto.

The Supreme Court has power to issue writs of quo warranto, in a case in which the whole community is directly interested.

The office of a director of the Real Estate Bank is a public franchise.

There is a wide and striking difference between the Constitution of the United States, and of a State.

The former is an enumeration and delegation of certain specified powers, granted by the States, or the people of the States, for national objects and purposes.

A State Constitution is a bill of rights, declaratory of the great and essential principles of civil and political justice, imposed as so many duties, and enjoined as so many restrictions, both upon the departments of government, and upon the people.

A State Legislature can exercise all power that is not expressly or impliedly prohibited by the Constitution; for whatever powers are not limited or restricted they inherently possess as a portion of the sovereignty of the State.

A State Constitution, like all other deeds or charters, is to be construed according to the sense of the terms used, and the intention of its authors.

It is to be construed as a frame of laws, established by the people according to their own free pleasure and sovereign will.

It should receive a fair and liberal interpretation.

The clause in the Constitution of this State, which provides that the General Assembly may incorporate one State Bank, and Branches, and that " they shall have further power to incorporate *one other* banking institution, &c." is to be construed as a limitation and a prohibition against the establishment of more than one other banking institution.

The Legislature can no more establish two banking institutions in promotion of the agricultural interest of the country, than it can create two Supreme Courts, or make that tribunal consist of more than three Judges, or establish and organize more than three departments of the government.

But the Legislature has the power to establish one banking institution, with any number of agencies, or offices of discount and deposite to transact its business—and may locate these offices or agencies at as many points or places as they may deem advisable or proper.

The Legislature contemplated, by the charter, the establishment of only one banking institution.

That part of the 21st section of the charter which declares that the Principal Bank and Branches may severally sue, &c. and have a common seal, is inoperative and void, as it is directly and positively opposed to the incorporating clause in the same section, and to the general objects and designs of the charter.

A stockholder cannot be deprived of the right of voting for the entire directory of the whole institution.

The respective boards must, by the election of directors, be made to conform to the number expressed in the charter. The stockholders, in organizing the corporation, had the right to vote for the whole directory of the Principal Bank and each of the Branches. But this was a personal privilege, which might be waived at pleasure, according to the discretion of each individual stockholder.

The central board represents the unity, sovereignty, and indivisibilty of the

Ff

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

corporation. The general interest of the Bank is committed to its custody, and it is invested with complete and plenary power for the well governing and ordering the affairs of the institution. It has complete and unlimited control over the acts and proceedings of the respective offices.

The duties enumerated in the charter, and imposed on the central board, cannot be transferred by the central board to any other body, without a violation of the charter.

The local boards are inferior, subordinate tribunals, possessing limited authority specially delegated to them by the charter. If they usurp powers conferred upon the central board, or if the central board attempts to delegate to them powers entrusted to itself, such act or acts are void, being repugnant to the charter.

The local boards cannot pass any by-law or ordinance affecting any other part of the corporation than that over which they respectively preside, and even then their authority is subjected to the control of the central board

The central board constitutes the revising and governing power of the corporation, and forms the bond of union which makes it *one common whole and one banking institution.*

The act of the Legislature, incorporating the Real Estate Bank, is therefore constitutional.

Upon the writ of quo warranto, the State is bound to show nothing.

The defendant must either disclaim or justify. If he disclaims, the State has judgment. If he justifies, he must show his title specially, and all the particulars on which it is founded.

The defendant, in his plea, should allege that he is a stockholder, and that the election under which he claims to have been chosen a director, was held under and in pursuance of an ordinance or direction of the central board of directors, fixing the time when, and the place where the same should be held, agreeably to the provisions and requirements of the charter. As the plea in this case does not do so, the demurrer to it is sustained.

The election for all the directors must be held at one and the same time, and at one and the same place; and the time and place must be ordained and appointed by the central board. The central board must also prescribe the rule by which directors shall be declared duly elected, and elections authenticated. These duties devolve on the central board, *and cannot be delegated* to the local boards.

On the application of the attorney for the State, separate writs issued, on the 20th day of February, A. D. 1839, out of this court against *Chester Ashley, Roswell Beebe, William W. Stevenson, E. A. More, R. C. Byrd, James De Baun,* and *James L. Dawson.* The writ against *Chester Ashley* was in the following form:

"STATE OF ARKANSAS, Scr.

*The State of Arkansas, to the Sheriff of Pulaski County,* GREETING:

" You are hereby commanded to summon *Chester Ashley* to appear personally before the Supreme Court of said State of Arkansas, at the court house in the city of Little Rock, in the county of Pulaski aforesaid, on the 21st day of February, in the year of Christ eighteen hundred and thirty-nine, then and there to answer unto the State of Arkansas aforesaid, and to show by what warrant he exercises the franchise of a director of the Principal Bank of the Real Estate Bank of the State of Arkansas, at Little Rock, and has entered into

and upon, and uses the powers, rights, and privileges, thereto apper-
taining: it being alleged that no legal or valid grant of said franchise,
to said *Chester Ashley*, has ever been made by and under the au-
thority of the said State of Arkansas, under the penalty prescribed
by law, and that you certify to our said Supreme Court how you exe-
cute this precept, and at your peril have you then and there this writ.

IN TESTIMONY WHEREOF, &c.

On the 18th day of March, *Ashley* filed his plea in abatement, ver-
ified by affidavit, which was as follows:

"And the said *Chester Ashley*, in his own proper person, comes and
prays judgment of the said writ of quo warranto; because he says,
that the writ of quo warranto lieth only in case where one or more
persons do unlawfully claim, hold, have, exercise, or enjoy some office,
corporate power, liberty, or franchise, which is of a public and general
nature, which emanates from the sovereign power of the State, and
in the use, exercise, or enjoyment whereof the whole people of the
State are directly interested and concerned; and that the office or
franchise of a director of the Principal Bank of the Real Estate Bank
of the State of Arkansas, at Little Rock, is not a public office, corpo-
rate power, liberty, or franchise, concerning which the court here
hath jurisdiction, to hear and determine by writ of quo warranto.

Wherefore, the said *Chester Ashley* prays judgment of the said
writ, that the court here will not hear and determine the same, and
that the same be quashed and held for nought."

To this plea the attorney for the State demurred, and the demurrer
was sustained; and the defendant *Ashley* then filed five several pleas
in bar, which, as finally amended, were severally demurred to by the
attorney for the State. The first plea, with which all the others sub-
stantially agreed, was as follows:

In the Supreme Court of the State of Arkansas, at January term,
A. D. 1839.

| | |
|---|---|
| CHESTER ASHLEY, defendant, *adsm.* THE STATE OF ARKANSAS, plaintiff, | *Writ of quo warranto.* |

The said *Chester Ashley* personally appears before the court here,
and answering unto the State aforesaid, and showing by what war-
rant he exercises the franchise of a director of the Principal Bank of
the Real Estate Bank of the State of Arkansas, at Little Rock, and

LITTLE ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

has entered into and upon, and uses the powers, rights, and privileges thereto appertaining, for plea in this behalf saith—

That in and by the sixth rule of an ordinance of the central board of directors of the Real Estate Bank of the State of Arkansas, in relation to the election of directors, adopted 9th November, 1838, it was, amongst other things, ordained, that the next election (thereafter) for directors of the Principal Bank and Branches, should be held on the first Monday of January, 1839, and annually thereafter on the same day; that thirty days' notice of the said election should be published by the President of the central board in all the newspapers published where said Principal Bank and Branches are located, in accordance with the 25th section of the charter, which charter was accepted by the subscribers, who, in conformity therewith, became stockholders in said Bank; that the respective boards should each appoint their commissioners, selected from the stockholders, to hold said election; that the polls should be kept open from 10 o'clock, A. M. to 4 o'clock, P. M.; that the said commissioners should immediately after the election of directors is completed, furnish the President of said Principal Bank or Branches with a certificate stating the persons voted for, and the number of votes given to each; that on receiving the said certificate the President should forthwith issue a certificate of election to the directors elected, countersigned by the cashier; and that the directors elected should immediately enter on the duties of their office. And the said *Chester Ashley* further saith, that by a resolution of the board of directors of the Principal Bank of said Real Estate Bank, at Little Rock, adopted 3rd of January, 1839, James De Baun, William E. Woodruff, and James Erwin, selected from among the stockholders, were appointed commissioners to hold the election for directors to said Principal Bank on the first Monday of January, 1839, and were by said resolution to receive and record the votes of all persons legally entitled to vote; and said commissioners, or a majority of them, were ordered thereafter to make due return thereof, to the Principal Bank aforesaid, and issue certificates of election to the persons elected, and were further directed to keep the polls for said election open from 10 o'clock, A. M. to 4 P. M. of said day.

And the said *Chester Ashley* further saith, that said election, due notice thereof having been first given, was holden by the said commissioners, on the said first Monday of January, at the banking house of said Principal Bank, between the hours of 10 o'clock, A. M. and

4 o'clock, P. M. and the polls being kept open from the first until the last mentioned hours of said day, for directors of said Principal Bank.

And the said *Chester Ashley* further saith, that upon said election two thousand and seven hundred and twenty-seven votes were offered to be given in, and this defendant received of the votes so offered seventeen hundred and thirty-nine votes, being a majority of all the votes offered to be given in, and so received by this defendant, were the votes of stockholders in said Bank.

And this defendant avers that the central board aforesaid had no authority of law to regulate the election aforesaid, in any other respect than to fix the time and place of holding the same; and that the board of directors of said Principal Bank had authority of law to regulate in all respects other than the time and place, the mode and manner of holding such election.

And the defendant further saith, that the said commissioners did, immediately after the election of directors at the time and place aforesaid was completed, furnish and make due return of said election to the Principal Bank aforesaid, and did issue certificates of election to the persons elected, and to this defendant, with others.

And this defendant further saith, that the said commissioners did, so far as in their power lay, comply with the sixth rule of the ordinance aforesaid, of the central board aforesaid, and did immediately after the election aforesaid was completed, furnish the President *pro tem.* of said Principal Bank, to wit, *Roswell Beebe*, who had been elected, and was then President *pro tem.* of said Principal Bank, by reason that Anthony H. Davies, the President thereof, had been, and continued to be up to and after that time absent, with a certificate stating that the persons voted for at said election, and the number of votes given to each; and that on receiving the said certificate, the said President *pro tem.* did forthwith issue a certificate of election, countersigned by the Cashier, and under the seal of the Bank, to the directors elected, and among them to this defendant; and this defendant being first sworn in, did thereupon immediately enter on the duties of his office as such director.

And so the said defendant saith that by the warrant aforesaid, he exercises the franchise of a director of the Principal Bank of the Real Estate Bank of the State of Arkansas, at Little Rock, and has entered into and upon, and uses the powers, rights, and privileges thereto appertaining, as he lawfully saith, for the reasons aforesaid.

LITTLE ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

The following is a copy of the rule of the central board, fixing the time, place, and manner of the election under which the defendant claimed:

RULE 6. The next election for directors of the Principal Bank and Branches, shall be held on the first Monday of January, 1839, and annually thereafter on the same day. Thirty days' notice of said election shall be published by the President of the central board in all the newspapers published where said Principal Bank and Branches are located, in accordance with the 25th section of the charter. The respective boards shall each appoint three commissioners, selected from the stockholders, to hold said election, and the polls shall be kept open from 10 o'clock, A. M. to 4 o'clock, P. M. The said commissioners shall immediately after the election of directors is completed, furnish the President of said Principal Bank and Branches with a certificate, stating the persons voted for, and the number of votes given to each. On receiving the said certificate, the President shall forthwith issue a certificate of election to the directors elected, countersigned by the Cashier. The directors elected shall immediately enter on the duties of their office. The President of the central board shall, at least 30 days before every such election, notify the Governor of said election, and request him to appoint the directors on the part of the State. And each stockholder shall vote in the district in which he resides, which district until otherwise altered, shall be the same as adopted by the board of Managers, and the stockholders shall vote only for directors in the district in which they may reside.

ADOPTED: 9th November, 1838.

COCKE & PIKE, for the State, filed the following argument upon the points discussed in the case:

Two questions arise in this case, in anticipation of the trial upon its merits: 1st, Is the office of directors of the Real Estate Bank such a franchise as that this writ will lie for usurpation of it? and 2nd, what is the proper judgment, and the effect of such judgment in quo warranto, as applied to this particular case.

As to the first question, it is contended by the defendants that the writ of quo warranto lay only for such franchises as were granted by, and might be repossessed by the Crown; and that this is not such a public franchise. To this we answer that,

1st. Informations in nature of a quo warranto, under the Statute of

LITTLE
ROCK,
Jan'y 1859

THE STATE
vs:
ASHLEY
& OTHERS.

Anne, lie only in cases where the writ of quo warranto would originally lie. And in order to fully understand the similarity between the writ of quo warranto and the information, it will be needful first to trace briefly the history of the writ and information. Formerly, and before the Statute of Gloucester, 18 Ed. I, the King exercised a power of sending commissioners to inquire into the right to franchises, and if no characters were produced, the liberties were seized into the King's hands *without any formal trial.* This being much complained of, the Statute of quo warranto was made to remedy the grievance. By that Statute, (6 Ed. I, printed and proclaimed in 30 Ed. I, and therefore generally cited as of that year,) it was provided that all persons ought to enjoy their franchises, if not usurped over, till the coming of the King, or justices in *Eyre.* The sheriff was to make proclamation, forty days before the *Eyre,* that *all* appear to show *quo warranto* they claim their franchises. If any person made default, his franchise should be seized into the King's hands, *till he appear, nomine districtionis,* and if then replevied by him if he answered immediately. But if the party came not, and replevied while *Eyre* sat in the county, the franchises were lost and forfeited forever. If the party had *himself* committed the usurpation, he was bound to answer without writ original; but if he alleged that his ancestor had died seized of the franchise, then an original was to be sued, in the form: "Rex, &c. *sum. per bonos summonitores a. quod sit, &c. ostensurus quo warranto tenet, &c.* Com. Dig. *title "quo war."* C. 1, 2. 2 *Inst.* 282; *Crabb,* 175.

By the same Statute, if the defendant whose ancestor had died seized, appeared upon the original, he was to answer, and replication and rejoinder to be made. If he did not appear, nor was epoigned, it was to be as in *Eyre.* Com. *Dig. title, quo war.* C. 2.

The appointment of justices in Eyre, or justices Itinerant, took place as early as the 18th year of Henry I, by whom the kingdom was divided into circuits, and three Justices in Eyre appointed to each. *Crabb,* 103. The necessity of these Justices was superseded, and their commissions not revived, (according to Sir Matthew Hale,) after the 10th year of Edward III. *Crabb,* 277. And informations in nature of quo warranto came into general use upon the cessation of Eyres. *Gilb. Rep.* 153. Lord Coke says, 2*nd Inst.* 498, that with justices in Eyre this branch lived, and with them it died. 1 *Str.* 105; *Rex* vs. *Bennett.*

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs*
ASHLEY
& OTHERS.

The writ of quo warranto was a *civil* writ, in the nature of a writ of right. The information was originally a *criminal* proceeding, used more frequently in the Exchequer than elsewhere; and the only judgment which could be given upon it was of fine for the usurpation; but when it was adopted in K. B. in place of the writ of quo warranto, it was adopted to answer all the ends and purposes of the old writ, and then judgment of ouster came to be the proper judgment upon it—so that it thereby became a *criminal* proceeding. See *Rex* vs. *Bennett,* 1 *Str.* 102; 2 *Inst.* 282; *Rex* vs. *Staverton, Yelv.* 190; *Rex* vs. *Stanton, Cro. Jac.* 260; *Co. Ent.* 527 to 564; *Rex* vs. *Ponsonby,* 1st *Ves.* 6.

It is broadly laid down, and is doubtless true, that " the courts will not extend the remedy by information beyond the limits prescribed to the old writ." 2 *Sel. N. P.* 323. The Statute of Anne does not purport to extend the remedy, or apply it to a new class of franchises or offices, but simply regulates the proceedings, and authorises private persons to interfere and file relations. *Rex* vs. *Frelawney,* 3 *Burr.* 1616; 2 *Uh. Sel. N. P.* 324; *Willcock,* 461.

Let us inquire then, what is a public franchise. In England, all public franchises emanated from the Crown. The information at common law, which came in to answer the ends and purposes of the old writ, lays for the usurpation, first, of franchises which the Crown had granted, and which were of such a nature that if the defendant had no title, they might be repossessed and enjoned by the King, as the franchise of *wrecks, waifs,* and *estrays:* Second, of franchises which the King had created, and which subsist in themselves, although there be no person in *esse,* who has a good title to them. Their nature is such that if the defendant be found to have no title to them, he must be ousted and forejudged of the enjoyment of them, but they are repossessed by the King: of this kind are corporate offices; so that if the officer, or all the officers be ousted, the franchise is not affected, but others may be appointed to fill their places, *either by* election by other persons, to whom the King has granted the power, or, if there are none capable of making such an election, by a new appointment of the Crown. *Willcock,* 454; *Strata Mercella,* 9 *Co. Rep.* 28; *Rex* vs. *Mayor of London,* 1 *Show.* 280.

A *corporate office,* then, which is created by Legislative grant, and is not merely *private* in its nature, is a public franchise. Is the present a merely private office? That it is not, is manifest from various considerations, to which we will hereafter advert. For the present,

let us proceed to consider what have in England been held public
franchises.

The franchise of judge of a court of record; *R.* vs. *Williams,* 1 *Burr.*
407: of Steward or Bailiff of a Court Lett; *R.* vs. *Hulston,* 1 *Str.* 621;
Bailiff of an incorporated town, *R.* vs. *Boyles,* 2 *Ld. Raym.* 1560;
Chief Constable of a hundred—Mayor, Aldermen, or Burgesses of a
City, *R.* vs. *Breton,* 4 *Burr.* 2261.

In the case of *The People* vs. *Utica, Ins. Co.* 15 *J. R.* 386, the Su-
preme Court of New York decided, that every privilege or immunity
*of a public nature,* which cannot legally be exercised without legisla-
tive grant, *is a public franchise;* and *that the right of banking is a
public* franchise. And this decision is broadly sustained by the de-
cision given in England, in K. B. *Rex* vs. *Nicholson et al.* 1 *Str.* 299,
where the court said that informations were frequently granted, where
any new jurisdiction, or *a public trust* was exercised without authority;
and that the rule, that it would not lie except where there was a usur-
pation on the Crown, was too general. See also *People* vs. *Niagara
Bank,* 6 *Cowen,* 196; *People* vs. *Hudson Bank,* 6 *Cowen,* 217.

In Pennsylvania, where the Statute of Anne was not re-enacted so
late as 1817, it was held that in *all* cases where a charter exists, and
a question arises concerning the exercise of an office claimed under
that charter, the court could grant leave to file an information. *Com.*
vs. *Arrison,* 15 *S. & R.* 127.

There are other considerations showing this to be a public fran-
chise. The Constitution of the State provides for the creation of this
Bank. The charter secures to the State a voice in all its transactions
for the State has two directors at each Branch, and a voice in the
central board: and finally, it is upon the faith and bonds of the State
that the capital of the Bank is based. It is therefore emphatically a
*public* institution; and offices created by and held under the charter
are *public* franchises.

We pass now to the second question. The second is, what is the
proper judgment upon a writ of quo warranto.

In the case of the *King* vs. *Mayor and Aldermen of Hertford,* 1st
*Salk.* 374, 1 *Ld. Raymond,* 426, leave was given to file an informa-
tion against the defendants to know by what warrant they admit per-
sons not residing within the borough to the freedom of the corporation.
And HOLT, *Chief Justice,* said if they were found guilty, they should
be fined; and the difference of the judgments in this case, and in the

gg

LITTLE writs of quo warranto is, that in the latter case the judgment is to seize
ROCK,
Jan'y 1839 the franchise into the King's hands: and in the other case only an
THE STATE ouster of the particular franchise.   This distinction of Lord Holt has
vs.
ASHLEY been quoted in the elementary books ever since, as establishing the
& OTHERS. position that on the writ of quo warranto the only judgment was of
seizure.   Does it establish this position?

Remark, 1st, That it is a mere extra-judicial opinion—a hasty re-
mark made without discussion, and in advance of the case—a decla-
ration of what would be the punishment.

2nd, It may be well understood to mean simply that in such a case
as the one before his Lordship, the judgment on the writ would be of
seizure.   That was a case of *misuser* of a franchise, and a proceed-
ing against the whole corporation.

In *Reg.* vs. *Blagdon, Gilb. Rep.* 153, it was said by *Salkeld arg.* (and
not contradicted by the counsel or court,) that "informations in
nature of quo warranto are formed to answer the design and end of
proceedings in *Eyre*," and that "as to such franchises *as the Crown
may have*, the judgment is that they be seized into the Queen's hands:
as to such as the Crown cannot have, the judgment must be that the
defendant be arrested, and the franchise extinguished."

So Lord HOLT himself, in *King* vs. *Mayor of London*, 1 *Shower*, 280,
said, "There are three sorts of *liberties:* a liberty granted from the
Crown, which doth subsist in the Crown; a liberty created *de novo;* and
doth exist, notwithstanding it be forfeited; and another, that cannot
exist but in the persons to whom it is granted.   In the first, judgment
to seize or oust is proper, for then it belongs to the Crown: if the
other be forfeited, judgment is for a seizure and no more; for, notwith-
standing the forfeiture, it exists in the Crown: for the latter, judgment
is proper to be given only for *ouster*, and that is the proper judgment."

So in the same case EYRES C. J. said, "for what the King can-
not have, for that a judgment of seizure cannot be had," and instan-
ced a Court Baron, where the judgment should be only of *ouster*.

In *Rex* vs. *Staverton, Yelv.* 190, reported in *Cro. Jac.* 259, as *Rex
vs. Stanton*, which is stated to have been "a quo warranto by the King
against the defendant for holding a *Court Leet* and *Court Baron*, within
hundred and manor of Warfield in the county of Berks, &c., it is said,
"This quo warranto is a writ of right in its nature:" and again—"by
15 *Edw.* IV, 7, if the party has continued possession of the liberty by
wrong, the judgment is, that he shall be *ousted;* but if he had once

title, and loses it, the judgment is, that the liberty shall be seized.

Note here, that the proceeding in that case was called " a writ of right in its nature." If then it was an information, as undoubtedly it was, the court considered it precisely similar to a *writ* of quo warranto, which is every where declared to be a writ of right for the King— and then, it follows that if judgment of ouster could be pronounced in one case, so it can in the other.

In the same case it is said in Croke, *per cur*—" Here the judgment is not that the King *shall seize;* because it is not any such franchise as the King shall have—but it is, that the defendant shall be ousted of that liberty as 15 *Edw.* IV, pl. 7 is. And so it was cited to be adjudged in Chadwell's case, for the manor of Exon."

Much confusion will be found in the decisions on this point unless we keep in mind that they apply to franchises of different kinds.— Thus if the franchise of having wrecks, waifs, or estrays, was forfeited by misuser or abuse, or usurped by one having no right to them, then on quo warranto it was seized into the King's hands; for it was a flower of his prerogative, and on forfeiture for abuse or usurpation, it could be repossessed by him. As to a corporate franchise in general, or in other words, the whole franchise granted by the charter, we shall shortly see that there has been much discussion as to the judgment for misuser or usurpation of it. As to corporate offices, such as the present, or the office of mayor or aldermen, which were not originally flowers of the prerogative, but are *created* by Legislative grant, or grant from the Crown, and where, if they are usurped, they may be filled by election or otherwise, there the judgment never was of *seizure*, but simply of *ouster*. Where there was in effect no franchise, but one was pretented, without any actual grant, there the judgment was neither of seizure, nor ouster, but of forejudger and fine. This distinction will reconcile all the cases. *Willcock*, 454, 499, 500.

In *Sir James Smith's case*, 4 *Mod.* 52, the question to be decided depended upon the judgment in the famous quo warranto case against the city of London. 2 *Shower*, 263.

In the time of Charles II, that King, wishing to bring the corporations throughout the kingdom under his control through his Crown lawyers, filed informations in nature of quo warranto against sundry corporations, and in the case against the *City of London*, judgment was given for seizure of its franchises to be a corporation, into the King's hands, as forfeited; and it was held that by this judgment that

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.
corporation was dissolved. In order to obtain such a judgment, *Saunders*, who had drawn the pleadings and advised on the part of the Crown, and who, when made Sergeant, wore as a motto on his rings, "*Principi sic placuit*," was made Chief Justice of K. B. just before the judgment was given.

In Sir James Smith's case, by the counsel who held that the corportion of the city of London was not dissolved by the judgment aforesaid, it was laid down as the law, "That though the King could create a corporation, yet he could not dissolve it, nor they dissolve themselves by any voluntary surrender; and that nothing can be seized into the King's hand, but such, which was part of the ancient inheritance of the Crown; and then 'tis immediately extinct—or else such things which have an existence, and may be restored, as *fairs, markets, &c.* That most of the authorities which seem to warrant a contrary opinion, happen in the latter part of the reign of *Henry* III, and between that and the reign of Richard II, which were tumultuous times, and then most of the corporations were seized by the King—and then, if the fault were in the Mayor, he seized the mayoralty, and put in a *Custos,* which was in order to preserve the corporation, and the writs of restitution were always according to the seizure.

They said farther—that "the judgments in quo warranto *are various—*as, when the franchises were totally usurped, then the judgment was *quod extinguantur;* but when they are abused, then 'tis *quod capiantur.*

*Pemberton, e contra,* argued, that in all concessions and grants of franchises there is a tacit condition implied that the persons to whom they are made shall use them justly, and that "'tis such a condition which, if broken, will determine the very grant itself. So likewise for misuser and abuse the whole franchises are forfeited forever. And he further argued that for such condition broken, the proper remedy was by a *quo warranto,* "which is called the King's writ of right, in which the supposed abuse of franchises is examined, and either the defendant is acquitted, or the franchises *capiantur,* which is the final judgment." "'Tis true," he admits, "there are other sorts of judgments upon the proceedings on this writ;" and instances the "*quod capiantur nomine districtionis,* on default."

The court said—"a corporation may be dissolved, for 'tis created upon a trust, and if that be broken, 'tis forfeited; but a judgment of seizure cannot be proper in such a case, for if it be dissolved, to

what purpose should it be seized?" Therefore they decided that by the judgment against the City of London, the corporation was not *dissolved*. And they said further: " wherever any judgment is given for the King for a liberty which is usurped, 'tis *quod extinguatur*—and that the person who usurped such a privilege *libertat. &c. nulla tenus intromittat, &c.* WHICH IS THE JUDGMENT OF OUSTER, but the *quo warranto* must be brought against particular persons." " But where 'tis for a liberty claimed by a corporation, there it must be brought against the body politick, in which case there may be a seizure of the *liberties; which will not warrant the seizure or dissolving of the corporation itself.* 4 *Mod.* 58. And be it remembered that Lord HOLT delivered this judgment.

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

The case of the *King* vs. *Amery*, and *The King* vs. *Monk*, 2 *T. R.* 515, is supposed to establish the principle against which we are contending, but it will be found not to apply to a corporate office.

It was an information in nature of *quo warranto.* Amery, in his defence claimed as alderman, and Monk as common councilman, of the City of Chester, (the offices which they were charged with usurping,) under a charter granted by Charles II. The prosecutor contending that the judgment in the reign of Charles II, by which the liberties, &c. of said City were seized into the King's hands, for the default of the Mayor, &c. in not appearing, was illegal; and consequently, the old charter not being thereby forfeited, the new one was void. The question therefore was, whether judgment of *seizure* was proper, on default of appearance; and if so, whether the corporation was dissolved? Ashhurst decided, that, as in Eyre, if the party did not appear there was judgment of seizure, *nomine districtionis;* and if he came not in during the Eyre, the franchise was forfeited forever. So in K. B. if the party came not in on *ven. fac.* and replevied his franchises, they were lost forever. That therefore the judgment of seizure on default was legal, and, by failure of the party to come in, a forfeiture was worked. It is manifest therefore that nothing was decided touching the form of judgment upon a trial, but only upon *default:* and note too, that the decision in this case was *reversed* in the House of Lords; and the judgment in the reign of Charles II held illegal.

The authorities cited by the counsel for the prosecution, have some bearing on this point. It was stated that Sir Robert Sawyer, in his argument in the London q. w. case, said that " what was intended by

LITTLE a judgment of *ouster* in that book, and in what cases by the course of
ROCK;
Jan'y 1839 the King's courts it ought to be, will best appear by an ancient rule,
THE STATE taken and agreed by the Judges in Edward IV's time, before they
*vs.*
ASHLEY¦ were promiscuously used. The rule is this: *where it clearly appears*
& OTHERS. *to the court that a liberty is usurped by wrong,* and upon no title, either
by the King's grant or otherwise, judgment only of ouster shall be
entered. But where it appears that the King or his ancestors have
once granted a liberty, and the liberty is *misused,* judgment of seizure
into the King's hands shall be given.

Seizure, it is also said, is in the nature of process to compel appear-
ance. It is like a distress to bring in the party, by putting him out
of possession of the liberty till he appear. When he appeared, he
could, by 6 Edward I, *replevy* the liberty. *Seizure* is said not to be
*forfeiture,* for " no man shall lose his land or his franchise, upon any
default, if he has never appeared." So in Ld. Raym. 17, the court
said, "if quo warranto be brought for usurping royal franchises, the
court give their opinion that the defendant hath no title to them, *unless*
they proceed and say, *ut abinde excludatur,* it avails *nothing. Rex et
Reg.* vs. *Knollys.*

The opposing counsel, in *The King* vs. *Amery,* laid down the same
principle, as having been decided in 15 Edward IV, 7—that " if the
party held a market by *wrong,* and without title, then judgment should
be of ouster. But if the King or his ancestors had it, and the party
had misused it, then judgment should be of seizure. 2 *T. R.* 551.—
The object of the counsel was to prove that a judgment of seizure
was proper; and they define it to be, *taking it from the party holding it.*

Note here, that in many reported cases you may not distinguish
whether the proceeding was by *writ* or *information*— inasmuch as it is
merely stated to be a " *quo warranto,* against, &c." From this it
would appear that they were looked upon as the same proceeding,
brought only into court in a different manner—the same edifice upon
different foundations.

It seems therefore to be clear that the judgment upon a writ of quo
warranto differed, as it does upon the information, and was governed
by the nature of the franchise, and the offence committed. The judg-
ment here, as in other cases, is governed by the peculiar rights and
interests involved. If a franchise was usurped, or by abuse, misuser
or non-user forfeited, which might revert to and be possessed by the
Crown, then the judgment was of seizure, and the King reclaimed

that portion of his prerogative which he had carved out, as it were, from the regal dignity, and conferred upon some individual or body corporate.

But an office in and under a corporation, filled by the election of the corporators, was not such a franchise. The King could not repos- ses himself of it. He could not exercise it. It was not, like the right to waifs, wrecks, or estrays, a power and right originally attached to the Crown, a part of the regal dignity, a flower of the prerogative.— There was no reason why, if an intruder seized upon it, his wrongful act should destroy the franchise. This franchise is but a part of the banking franchise conferred by the charter. Even if the charter could be forfeited, yet common sense at once indicates that a particular franchise cannot. The corporators here have performed no act which could forfeit either the whole charter, or any particular franchise; for the intrusion in this case is the act of but a few.

The charter is a contract. It cannot be violated; nor can it be forfeited except by act of the corporators. So is the charter of an incorporated town; and it might as well be contended that the usurpation by an individual of the office of bailiff, would forfeit the charter of the town. Evidently it is supposed by the opposing counsel that the writ of quo warranto was originally used only for the purpose of retaking into the King's hands such franchises as he had granted out, and which were flowers of the prerogative. This is clearly errone- ous. From time immemorial, it was used in case of the usurpation of corporate offices. In the case of the City of London, and the other cases growing out of that case, this was admitted uniformly on all hands. Once admit this, and it is admitted also that the judgment of ouster was in a certain class of cases proper under the old writ.

For a corporate office is a franchise granted by the King or Com- monwealth in perpetuity; not to revert to, and be again possessed by the power that created and granted it, but to exist so long as the char- ter exists: and unless by forfeiture of the charter, no forfeiture can be worked of the franchise growing out of, and dependant upon it.

In the present case a judgment of seizure, forejudger, or extinguish- ment, would be manifestly absurd. How shall this particular franchise be forfeited, forejudged, or extinguished, and still the charter subsist? How shall this particular franchise be seized into the hands of the Commonwealth? Can it exist and be exercised by the State, unless by revocation of the charter?

LITTLE
ROCK.
Jan'y 1839
THE STATE
*vs.*
ASHLEY
& OTHERS.

But it is unnecessary further to pursue this argument—for if the distinction which we have heretofore laid down as to the different judgments, be correct, then all the cases are reconciled, and the judgment of ouster is plainly the only one which can be given in this case.

Having discussed, and, as we flatter ourselves, clearly demonstrated that this is a public franchise, and that the judgment on this writ will be of ouster, we will pass to the consideration of those questions which arise upon the construction of the charter. It is evident from the whole tenor of that instrument, that it was the design of the Legislature to invest the central board with the general superintending control over the interests of the Bank. It is the supervising and governing power. It alone looks to the interest of the whole, and to each of its several parts. It is, in short, the supreme legislative branch of the corporation empowered to ordain and establish such by-laws, rules, regulations, and ordinances as they may deem necessary and suitable for the well governing and ordering the affairs of the Bank, and necessary and proper to advance the general interests of the corporation; provided the same be not contrary to the provisions of the charter, or constitution or laws of the State. The board of directors elected for the Principal Bank and the several branches, are inferior, subordinate tribunals, appointed to conduct and superintend the local and individual interests of the respective Branches over which they preside, and are expressly and positively forbidden from doing any thing that may be contrary to any rule, by-law, ordinance, or regulation of the central board of direction. Their power does not extend to the making of general rules and ordinances for the government of the whole corporation. They can pass no by-law or ordinance binding upon any other part of the corporation, than the Bank or Branch over which they immediately preside, and not even then, if it should conflict with any law or ordinance of the central board. The central board, if we may be allowed so to speak, represents the unity and sovereignty of the corporation. It is the band of union which binds its separate, component parts together in one common whole. If the directors of the Principal Bank and its several Branches are co-ordinate and independent tribunals, amenable to no common superior, and united by no common band, they might in effect be so many independent Banks and the charter might, in the opinion of some, amount to a violation of the constitution. Such manifestly could not have been the intention of the Legislature, and the construction for which we contend escapes

LITTLE ROCK.
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

this difficulty. Regarding the central board as the common head under which all the different members are united, and subjected to one common control, and it is in substance and effect but one institution, one whole of which each Branch is a part. By reference to the 9th, 21st, and 22nd sections of the charter, it will be seen that the positions we have assumed, and the view we have taken of the powers of the central board, and of the boards of directors, is fully sustained by the language of that instrument. The 9th section enumerates several specific powers and duties, specifically enjoined upon the central board. In regard to those enumerated duties the central board have no discretion; they are bound to perform them, and cannot confide their performance by any regulation or ordinance they may make to any other body of officers attached to the institution. They are duties of an important and prominent character, affecting the interest of the whole corporation, which the legislature could well foresee and provide for; and they have therefore distinctly set them out, and made it imperative upon the board to discharge them. But it surely cannot be urged for one moment, that this enumeration includes all the powers intended to be conferred by the charter upon the central board. That because the Legislature has thought proper to enjoin upon them the performance of certain specified duties, they thereby intended to deny them the right to exercise every other power. The whole tenor and spirit of the charter, as well as its express language, absolutely forbid such a construction. The Legislature well knew that it would be impossible to enter into a minute and precise detail of all the powers and duties which it might become necessary for the central board to exercise for the safety and welfare of the institution. They have therefore wisely conferred upon that board the right to exercise such other powers for the well-governing and ordering of the affairs of the Bank, as may be deemed necessary and proper to advance the general interest, subject only to the limitations to which we have already adverted. In the 21st section the subscribers to the capital stock of the Bank are created a corporation and body politic, with power to ordain and establish such by-laws, rules, regulations, and ordinances, as they shall deem necessary and suitable for the government of said corporation, not being contrary to this act, nor to the constitution of the United States, or of this State. By whom are those powers thus conferred upon the corporation to be exercised? By the stockholders en masse? Or by officers chosen by the company, and charged by law with the

nh

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS,

general control and government of the institution, and who represent the sovereignty of the corporation? Evidently the latter. All corporations consisting of numerous stockholders must necessarily act through those charged with the control and superintendence of its affairs, and powers given to the corporation are properly exercised by that tribunal, whatever may be its name, to which the general government of the company has been confided. The central board, we contend, is, in the Real Estate Bank, the tribunal that can alone exercise these general powers granted to the corporation. The board of directors for the Principal Bank and Branches, cannot exercise them; for they are in the very next section positively forbidden to pass any rule or ordinance in violation of any by-law, rule, ordinance, or regulation of the central board. To say therefore that the board of directors, and not the central board, is the proper tribunal to carry into effect this general grant of power to the corporation, involves the palpable absurdity of making the inferior greater than the superior. It is under the grants of power contained in the 9th and 21st sections we contend the central board had clearly and unquestionably the right to prescribe the manner in which the returns of the elections should be made and the result declared. It was a rule which they deemed necessary for the well ordering and governing of the affairs of the Bank. It is not only necessary that the directors should be elected, but they should have certain, legal evidences of the fact. The commissions which the sixth rule requires the President to issue upon the certificates of the commissioners appointed to hold the election, are the credentials which evidence to each director, and to the world, that he has been duly elected, and has a right to exercise the duties of his office. It is the public, legal, official declaration of the fact. We have examined the charter with some degree of vigilance and care, to ascertain whether any of its provisions are violated by this rule, and confess we have not met with any section or clause with which it in any degree conflicts, either directly or indirectly, according to any fair and just rule of construction. The 25th section of the charter is the one which relates to the election of directors, and in it the court will again find a recognition of the principle for which we have been contending—that it is the central board, and not the board of directors, to which are referred those subjects affecting the general rights and powers of the corporation. That section says that after the first appointment of directors, the central board shall fix upon the time

for holding the future elections, as well for the Branches as the Princi-
pal Bank.  It farther says that the director who shall receive a ma-
jority of the votes given, shall be declared elected.  But how, by
whom, or in what manner shall he be declared elected?  When a
thing is commanded to be done, there must be some officer or agent to
do it, and some mode or manner of doing it.  Upon this subject the
charter is wholly silent.  It does not say by whom or in what manner
this declaration shall be made.  It provides no mode in which the evi-
dence of election shall be officially and authoritatively made known
to the person elected, or to the public.  If the central board have no
right to direct by whom, and the manner in which, the result of the
election shall be declared, where, we would ask, since the charter is
wholly silent in this respect, do the commissioners of the election
derive the power to make this declaration, and issue to the persons
chosen the certificate of election?  The reasoning which would de-
prive the central board of this right, would apply with double force to
its exercise by the commissioners.  And yet we presume no man will
say that it is not necessary and proper for the well governing and or-
dering of the affairs of the Bank, to give legal and official evidence of
the fact, that certain persons were duly elected.  Such a step is indis-
pensably necessary, and the charter expressly says it shall be declared.
But it does not say how or by whom.  Whether by the viva voce
proclamation of the commissioners, or their certificates delivered to the
persons elected, or by commissions issuing from the President, and
countersigned by the cashier.  The charter, then, being silent in
regard to this question, what tribunal is so proper to prescribe the rule
as that to which a general and superintending control over the affairs
of the corporation has been given.  It is necessary that this declara-
tion should be made by some one, and in some form; and if the central
board has not the power to prescribe the rule, what person has?—
Have the board of directors?  Such a right given them, is no where to
be found in the charter.  On the contrary they are expressly forbidden
to do any thing in violation of the by-laws, regulations, and ordinan-
ces of the central board.  What tribunal, we again ask, shall prescribe
the rule for making the authentic and official declaration of the elec-
tion?  Without some such notification, all would be confusion and
doubt.  It could not be known with certainty who were elected.—
Men might enter upon the discharge of the duties of a high and res-
ponsible trust, involving deeply not only the interests of the stockhold-

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

ers, but of the State at large, without any definite credentials of office, without any thing to show they had been legally chosen to exercise its functions.

Was it not right and proper, then, for the well governing of the affairs of the Bank, that the central board should have made some rule by which those receiving a majority of the votes might be officially notified of their election; that the stockholders, the public, and the officers of the Bank, might know and respect them as such. The rule of the central board, so far from violating the charter, is auxiliary to it. It aids and asssists in doing that very thing which the charter requires should be done, but for the doing of which it had prescribed no rule or regulation. Whether the mode pointed out by the central board is the wisest and best, is not, as we conceive, open to the investigation of the court. If they have the power to make a rule upon the subject, they have a right to make such an one as they think best. It is competent for the court to pass upon their legal and constitutional powers. But where they have the power, and do not overstep its limits, the matter rests peculiarly within the discretion of the board; and in the exercise of that discretion, this court cannot control them. If they have the right, as we think we have demonstrated, to make this rule, it must be adhered to. The local board can make no by-law or regulation in conflict with it. And those gentlemen who now claim to be directors under the late election, and have gone on to act as such in violation of this rule, can be regarded in no other light than as intruders into the office. The election is inchoate, and no right becomes vested in them until their election has been declared, and commissions issued in obedience to this rule. If the officers appointed to make this declaration, and issue the commissions, refuse to do so when they ought, the parties injured may have their redress, and compel them to do so, by appealing to the courts of the country. If these gentlemen have been rightfully elected, and the President should refuse to issue the commissions, and declare them duly chosen, they could obtain a writ of Mandamus, and coerce him to do his duty. But until they have received the official credentials of their election, they have no right to enter upon and discharge the duties of the office, and in doing so they are guilty of flagrant intrusion and usurpation.

We farther contend that the commissioners in rejecting a large number of votes offered, were guilty, to say the least of it, of palpable wrong and injustice. They had no right to go behind the decision of

the board of managers, and of the central board, to enquire into the legal right of those claiming under the decision of those boards to be stockholders. We care not whether they be stockholders de jure or de facto. In either event the commissioners are bound to receive the votes. The only question for the decision of the commissioners and for this court, is, whether the persons, whose votes were rejected, were stockholders de facto at the time of election. If they were, their right to vote could not be denied until they have been ousted by the competent tribunal. In the case of *Symmers* vs. *Rex*, *Cowper*, 489, where the question was upon the legality of a certain election held by corporators, the court below refused to go into an examination of the right of certain electors to vote; and it was contended by counsel against the decision of the court below, that if the legality of these votes could not be entered into upon this information, a presiding officer at an election can have no power of examining whether the votes are legal or not. But in all elections, particularly of members to parliament, the presiding officer exercises his judgment whether a vote is good or not. If the presiding officer has no right to judge, there can be no action for a false return. To this argument of the counsel, Lord Mansfield, in delivering the opinion, gave a full and conclusive answer, which applies with peculiar force and point to the question in this case. He says " The next question, which is one of less difficulty, is, that the judge below has refused to go into the qualification and capacity of several freemen and common councilmen, who offered their votes. Let us state the objection as it is put, and examine it.— The proposition is, that the judge on this information should have done exactly what he ought to have done, if the title of those persons who were common councilmen de facto, had actually been in question before him upon quo warranto. They were de facto members of the corporation, admitted, sworn, and in the actual enjoyment of the office. The question is, whether the judge, collaterally at the trial, ought to have gone into the validity of these men's titles. *Could the Mayor have gone into them at the time of election? I am very clear he could not.* There are modes sufficient open to the partiality of returning officers, without adding more. Whether the qualification is to be judged of by him, it cannot be avoided. In cases of elections in the city of London, certain qualifications are required at the polls. Therefore it must be seen, that in some degree the candidates have that qualification. So when an election is to be tried which may involve

*[margin:]* LITTLE ROCK, Jan'y 1839 THE STATE vs. ASHLEY & OTHERS.

LITTLE
ROCK,
Jan'y 1839
~~~~~~
THE STATE
vs.
ASHLEY
& OTHERS.
many other rights. But where the *right of election is in freemen in their corporate description, whether they were duly chosen or not, is not to be tried at the election of a third person. But they must be properly ousted.*" Of the same opinion were Justices Aston and Ashurst. To this we invite the attentive examination of the court.

We farther contend that the exclusion of those votes rendered the whole election illegal and void; for it is impossible to say what change in the result the admission of these votes might have made. In the *King* vs. *Mein*, it is said——" In corporation meetings it has been frequently held that when an act is to be done by the corporation, and one of the corporators had not been summoned, the acts of the meeting are void; and the reason given is because, though he could not have have formed a majority by himself, he might have influenced the others. In *Rex* vs. *May*, 5 *Burr.* 2681, this principle is more fully stated and illustrated. See also *Kynaston* vs. *The Mayor and Council of Shrewsbury*, 2 *Str.* 1051; *Sir Charles Musgrove* vs. *Nevison*, 1 *Str.* 584, 2nd *Ld. Raym.* 1358.

And the case being further argued by ASHLEY for the defendants, and CUMMINS for the State,

LACY, *Judge*, delivered the opinion of the court:

The pleadings in this case, present first, the question of jurisdiction; secondly, the constitutionality of the Real Estate Bank of the State of Arkansas; and lastly, the construction of the relative powers of the respective boards of direction.

The question involves principles of the highest moment, and of the most vital importance, and such as the whole community as well as the parties upon the record, have a direct and immediate interest in having conclusively and finally settled.

Their novelty, magnitude, and intrinsic difficulty, have induced this court to give to them the most mature examination and reflection; and have sensibly impressed them with the highly responsible and delicate duty they are called on to perform.

At a previous day of the present term of the Supreme Court, the Attorney for the State filed his motion in writing for a writ of quo warranto against the defendant.

The writ was ordered to be issued, and was made out under the direction and seal of the court. It is simply a citation directed to the Sheriff of Pulaski county, commanding him to summon *Chester Ashley*.

to appear before the Supreme Court, and show unto the State, the warrant by which he exercises the franchise of a director of the Principal Bank of the Real Estate Bank of the State of Arkansas, at the City of Little Rock; which it alleges was never lawfully granted to him. The writ was issued on the 12st day of February 1839, was executed the same day, and made returnable the day after; upon the return of it, the defendent came into court, and moved to have the writ set aside for want of jurisdiction; which motion was overuled. He then appeared, and put in a plea of abatement to the jurisdiction of the court, alleging the office of Director of the Principal Bank of the Real Estate Bank of the State of Arkansas was a private right, and not a public franchise. To this plea the Attorney for the State demurred, and the demurrer was sustained, and the plea held to be insufficient; and a judgment of *respondeat ouster* was entered up in the cause.

The defendent thereupon, put in five several pleas, justifying his title to the franchise in question, and showing the warrant by which he claimed to be elected to exercise the office of director. To these pleas there was also a demurrer, and after argument by counsel on the point, the demurrer was sustained and the pleas declared to be defective, in not setting forth a good and sufficient warrant, according to the provisions of the charter. The defendent then asked and obtained leave to amend his pleadings; whereupon he filed an amedment to each of his five several pleas previously put in, to which the Attorney for the State demurred, and there was joinder in the demurrer

The case now stands for trial upon the pleadings and issue thus made up by the parties.

The court have met with little or no difficulty in settling the question of jurisdiction. The point was fully discussed and directly decided, during the present term, in the case of *The State* against *Chester Ashley* and others, on a motion for an information in the nature of a writ of quo warranto. The Chief Justice, in delivering the opinion in that case, laid down the doctrine, that the Supreme Court had jurisdiction in cases of quo warranto, in which the whole community was directly interested, and that the ancient writ in such cases, (which was adopted by our constitution,) was wholly a civil proceeding, and that it could only be issued and prosecuted in the name and under the authority of the State, by her properly constituted legal officer.

The soundness and correctness of this opinion, it is believed, can neither be questioned nor controverted by any fair mode of reasoning,

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

or upon any just or respectable weight of authority. In reviewing the principles, then, as heretofore established in the case above referred to, the question of jurisdiction, so far as regards the power of the Supreme Court to issue the writ, is conclusively settled. The constitution, by express grant, confers upon it "power to issue writs of error and supersedeas, certiorari, habeas corpus, mandamus, and quo warranto, and other remedial writs, and to hear and determine the same." See Art. VI, Sec. 2, of the Constitution.

It now remains to be seen, whether the office of director of the Principal Bank of the Real Estate Bank of the State of Arkansas, is a private right or a public franchise. This question was decided in overruling the defendant's plea in abatement to the jurisdiction of the court. But as that opinion was not committed to writing, it may not be amiss here to state the grounds upon which it was predicated. That the office of director is a public franchise and not a private right, is perfectly manifest; for the legislature in granting the charter, created the office and prescribed the manner of filling it. It is equally clear that the charter is a public law, and not a private act; for the privilege of banking cannot be exercised without authority of law, and in its very nature and essence it appertains and essentially belongs to the act of sovereignty. In the case of *The People* vs. *The Utica Insurance Company*, 15 *John. Rep.* 386, the Supreme Court of New York held this emphatic language: "That every privilege or immunity of a public nature, which cannot legally be exercised without a legislative grant, is a public franchise, and that the *right of banking is a public franchise*." This principle is broadly asserted in the court of the King's Bench in the case of *The King* vs. *Nicholson, et al.* 1 *Str.* 297. See also the case of *The People* vs. *Niagara Bank*, 6 *Cow.* 296. Besides, by the express terms of the charter, the State has a voice in all the transactions of the Bank, by the appointment of two members in the board of directors of the Principal Bank and each of the Branches, and four directors in the central board. The capital of the Bank is raised upon her faith and credit, pledged in the form of bonds, regularly executed, and made payable to the Bank. If each and all of these facts and circumstances do not show that the State, and consequently the whole community have a direct and vital interest in the government and management of the corporation, then it is difficult to conceive a case in which she can be interested, or imagine a law of a more general and public nature.

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

If these positions be true, and that they are seems almost self-evident, then it necessarily follows, that the Supreme Court has jurisdiction of the case now under consideration; and that the office of director of the Principal Bank of the Real Estate Bank of Arkansas, is a public franchise and not a private right, and consequently the writ of quo warranto will well lie in behalf of the State, provided the defendant has unlawfully usurped or intruded into, and exercised the duties or franchises of the office.

Before we proceed to the examination of the second question, it is necessary to define what is meant by a constitution, and to lay down a few general rules of interpretation applicable to such instruments. An American constitution, according to the theory and practice of our peculiar systems, is the supreme, original, and written will of the people, acting in their highest sovereign capacity, creating and organizing the form of government, assigning to the different departments, their respective powers and duties, and restraining each and all of them, within their own proper and peculiar spheres. The powers, which are conferred, the restrictions, which are imposed, the authorities, which are exercised, and the organization and distribution of them, are all intended for the common benefit, and they are as essential to the maintenance and security of the entire plan, as they are to the protection and preservation of liberty itself. The principles which are thus declared by the sovereign will, must of necessity forever remain inviolate and fundamental, so long as the form of government under which they are established exists; or written constitutions, with all their boasted excellencies, are mere idle ceremonies or useless inventions. To deny their sovereignty and inviolability, is at once to impeach the right of self-government, and to destroy the only means by which that blessing can be perpetuated. The constitution of the State is, then, the supreme, paramount law of the land, except it comes in conflict with the constitution of the United States, or with the laws and treaties of the general government, made in pursuance of its authority; and the courts are bound so to treat and consider it. We are not aware that this doctrine has ever been impugned or denied by any respectable authority, since the decision in the case of *Marbury* vs. *Madison.* The Chief Justice of the United States then placed it upon such high and unquestionable ground, that since that time, it never has been attempted to be shaken, and it is now universally acquiesced in, and admitted by every intelligent man in

ii

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.
the community. There is certainly a wide and striking difference between the constitution of the United States and of a State government. The one is an enumeration and a delegation of certain specified powers, granted by the States, or the people of the States, for national purposes and objects. Hence, Congress can exercise no power that is not specifically granted by the constitution, or incidentally included among some of its enumerated powers. By an inspection and examination of all the State constitutions of our own country, they will be found to be nothing more or less, than so many bills of rights, declaratory of the great and essential principles of civil and political justice, imposed as so many duties, and enjoined as so many restrictions, both upon the departments of the government, and upon the people. The legislature then can exercise all power that is not expressly or impliedly prohibited by the constitution; for whatever powers are not limited or restricted, they inherently possess as a portion of the sovereignty of the State.

The question then recurs, is there any prohibiting or restraining clause in the constitution, interdicting the legislature from incorporating the Real Estate Bank of the State of Arkansas? That this question is put directly in issue by the pleadings, is perfectly manifest; for admitting that the defendant has shown a good warrant, according to the provisions of the charter; yet if the charter itself has no validity or constitutional existence, it surely cannot be pretended that he is entitled to hold, or can be rightly inducted into an office created by an act which, in the nature of things, can have no legal entity or being. Therefore, whenever the attorney for the State applied for, and obtained the writ, the validity of the charter was unavoidably drawn in question, and the court was constrained to meet and decide it.

Before we proceed to consider the clause in the constitution bearing upon this question, we will lay down the following rules of interpretation for that instrument.

1st. The constitution, like all other deeds or charters, is to be construed according to the sense of the terms used, and the intention of its authors.

2nd. It is to be construed, says Judge Story, " as a frame of laws established by the people according to their own free pleasure and sovereign will."

3rd. It should receive a fair and liberal interpretation, so that the true objects of the grant may be promoted, and the government left

in the full and free exercise and enjoyment of all its rights, privileges, <span>LITTLE ROCK,</span>
and immunities, which are not excepted out of its ordinary and general <span>Jan'y 1839</span>
powers, and declared by the sovereign will to be inviolate and <span>THE STATE</span>
supreme.                                                                    <span>vs.</span>
                                                                            <span>ASHLEY</span>
The constitution declares "that the General Assembly may incor- <span>& OTHERS</span>
porate one State Bank, with such amount of capital as may be deemed
necessary, and such number of branches as may be required for the
public convenience; which shall become the repository of the funds
belonging to, or under the control of the State, and shall be required
to loan them out throughout the State, and in each county, in propor-
tion to representation.   And they shall have further power to incorpo-
rate *one other banking institution*, calculated to aid and promote the
great agricultural interest of the country; and the faith and credit of
the State may be pledged to raise the funds necessary to carry into
operation, the *two Banks herein specified*: provided, such security can
be given by the individual stockholders as will guarantee the State
against loss or injury." See article 8, sec. 1, of the Constitution.   It
is contended that this clause imposes no restrictions upon the legisla-
ture, as to the number of Banks; but that they may establish as many
as they deem necessary and proper, for the general interest or public
convenience.   It is said to be merely an affirmative grant of power,
which the legislature was fully invested with, without any such decla-
ration, and therefore it imposes no limitation on their authority.

The argument, although plausible and ingenious, cannot be admitted
to be sound or logical, without virtually repealing the prohibition
intended to be secured by the Convention.   There are two ways of
imposing a constitutional restriction or limitation.   The grant may
contain negative words, denying in express terms, the exercise of the
power claimed or attempted to be usurped; or it may simply contain
an affirmation, which amounts to as positive a negation of any other
power upon the same subject, as if the grant itself had employed
nagative, and not affirmative words in the declaration.   The consti-
tions of the United States and of the States, furnish satisfactory and
conclusive proof of the truth and importance of the principle here
stated.   Indeed it will be found from an examination of those instru-
ments, that the usual and more general mode of imposing restrictions,
is by affirmative words, " which in their operation imply a negative
of other objects, than those affirmed; and in such cases, a negative or
exclusive sense must be given to the words, or they will have no ope-
ration at all."

The general rule upon the subject is, " a specification of particulars is an exclusion of generals; or the expression of one thing is the exclusion of another." And Lord Bacon remarks, "that as exception strengthens the force of law, in cases not excepted, so enumeration weakens it, in cases not enumerated." Congress has power to regulate commerce with foreign nations, and with the Indian tribes, to declare war, to grant letters of marque and reprisal, to coin money, and regulate the the value thereof. These powers are given affirmatively by the grant, and yet they clearly and conclusively indicate a restrictive sense; for it never was imagined by any one, that the States could exercise any one of the powers here enumerated. They are as clearly prohibited from so doing, as from passing any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or making any thing but gold and silver a lawful tender in payment of debts; which latter restrictions are imposed by express negative terms. The constitution of this State divides the powers of government into three separate and distinct departments, and assigns those which are legislative to one, those which are executive to another, and those which are judicial to a third. Can it be contended, that the legislature has power to create another department of government? and yet this is a mere affirmation of power, without any express or positive words, negativing their authority.

But is not the prohibition as full and as explicit as if the constitution had declared that the legislature should have no power to organize any other department. Again, it declares that the supreme, executive power of the State, shall be vested in a chief magistrate, who shall be styled " the Governor of the State of Arkansas." Can the supreme executive power of the State, be vested in more than one chief magistrate, or can he be styled by any other name than " the Governor of the State?" Certainly not. The judicial power of the State is vested in one Supreme Court, in Circuit Courts, in County Courts, in Probate Courts, and Justices of the Peace. The Supreme Court is made to consist of three judges. Have the legislature power to create more than one Supreme Court, or to compose that tribunal of more than three judges? The simple statement of the question carries with it the answer. The grant, however, contains no express negative terms; but its affirmation implies as positive a negation, as if it had been expressly so declared. The legislative power of the State is vested in a Senate and House of Representatives. Can there be

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

any other legislative branches of government? The Senate shall consist of members to be chosen every four years, and the House of Representatives, every two years. Can the Senate be directed to be chosen every two years, and the House of Representatives annually? In these instances, the legislative is only limited by affirmative words, which carry with them an exclusive or restrictive sense. The clause limiting the number of banks to two, is clear, explicit, and peremptory. The General Assembly has no more power to create two State Banks, than it has to create two executives, two senates, or two houses of representatives. The language in both cases is affirmative; but it is not on that account less restrictive or authoritative. Could they make any other bank than the State Bank contemplated in the constitution, the repository of the funds belonging to the State. Certainly not.— Why? Because the clause we are considering gives to that bank the custody or deposite of these funds. The legislature, then, has power to incorporate only one State Bank, with such a number of Branches as the public convenience may require. The latter part of the section declares, " that they shall further have power to incorporate *one other banking institution*, calculated to aid and promote the great agricultural interest of the country, and the faith and credit of the State may be pledged to raise the funds necessary to carry into operation the *two banks herein specified*. The term banking institution is somewhat indefinite; but it is nevertheless capable of receiving a proper legal construction. If it was even uncertain what was meant by it, still the sentence taken together, clearly defines its meaning; for it declares, that the faith and credit of the State may be pledged to carry into operation "the two banks herein specified;"—thus showing that the convention contemplated the establishment of two banks, one State Bank with Branches, and one other such Bank as that mentioned in the constitution. They have no more power to create or incorporate two banking institutions, in aid and in promotion of the agricultural interest of the country, than they have to create two Supreme Courts, or to make that tribunal consist of more than three judges, or to establish and organize more than three departments of government. Not to give to the clause we are considering a prohibitory and limited sense, is to render it wholly inoperative and void, and that too, in express violation of its restricted language, and the object and design of the convention. Whether the restriction sought to be imposed, will be found practical or salutary, or whether it will answer the pur-

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

poses that its authors had in view, are questions which the court is not called on to decide.    The motives and object of the convention in inserting this section, cannot be forgotten or mistaken by any one at all conversant with the transactions or proceedings of that body.  The whole currency of the nation was then in a state of disorder and confusion, threatening serious and calamitous mischief to the community; and the evils apprehended, and which were attempted to be remedied, were an excessive issue and circulation of depreciated bank paper, created by the means of State institutions, which were rapidly springing up in every quarter of the country.   This state of things, induced the convention to endeavor to limit the number of banks of our own State, hoping to mitigate the contagion of excessive banking that was then likely to fall upon every part of the Union; the existence and continuance of which has since so seriously affected all the great and flourishing interests of society.   Whether they have done much, or little, to cure the evil, or whether they may have aggravated it, time and future events will alone determine.

If the convention, however, has limited the number to two banks, and that they have, seems to our minds clearly demonstrable, then, this court is bound to see the prohibition and injunction of the constitution strictly followed and obeyed.   The legislature, then, unquestionably possesses the power to incorporate one banking institution calculated to aid and promote the agricultural interests of the country. The question then remaining to be determined, is, does the act of the General Assembly incorporating the Real Estate Bank, create such an institution, consisting of four integral parts or offices of discount and deposite, or does it establish four independent and separate banks?

It is to be regretted, that the charter is so exceedingly vague and uncertain, that it is almost impossible to apply to it any thing like legal accuracy.   Many of its most important clauses are contradictory and irreconcilable with each other, and with the general objects and spirit of the act.   The court, however, in considering it, must keep in view the nature and design of the grant, its general intention and scope, as they appear from the entire structure of the charter, regarded as a whole, as well as from all its component parts.   The charter is a contract between the stockholders and the State, founded upon a valuable consideration, with all the powers and privileges conferred upon it by the act of incorporation.    In the first instance the contract is executory, because certain precedent conditions are imposed upon the

stockholders, but it has been, or may become executed, whenever the LITTLE ROCK,
conditions are complied with and the charter accepted; and the rights Jan'y 1839
and franchises established by the act, become complete and vested in THE STATE
the corporation.                                                      vs.
                                                                     ASHLEY
In the celebrated case of *Dart. Col.* vs. *Woodward*, a corporation is & OTHERS.
defined to be "an artificial being, invisible, intangible, and existing
only in contemplation of law." As it is the mere creature of law, it
can only possess those properties, which the charter of its creation,
expressly or impliedly confer upon it. Among these are its immor-
tality and individuality; properties by which a perpetual succession
may be kept up, so that its members may act with the will of a single
individual. This investiture of its personality by law, enables a suc-
cession of individuals to promote the general objects of the charter;
for it endows them with certain powers and franchises, which, though
they might be exercised through the medium of its natural members,
are yet considered as subsisting in the corporation itself, as distinctly
as if it was a real person, or an immortal being. This artificial per-
sonage does not share in the civil government of the country, unless
that be the purpose for which it was created; nor is it responsible in its
corporate capacity for personal misdemeanors or crimes. "The objects
for which a corporation is created, are universally such as the gov-
ernment wishes to promote. They are deemed beneficial, and that
usually constitutes the consideration for which it is created." After a
corporation is so formed, it necessarily and inseparably acquires cer-
tain incidental powers, as constituent parts of its corporate existence.
Among these are, 1st, the power to have a perpetual succession, and
of course the power of electing members in room of those removed by
death or otherwise. 2nd, To sue and be sued, implead and be im-
pleaded, to grant and receive by its corporate name. 3rd, To pur-
chase and hold lands and chattels. 4th, To have a common seal.—
5th, The power of amotion or removal of its members. 6th, To make
by-laws for the government of the corporation. *4 Wheaton Rep.* 515,
*Dartmouth College* vs. *Woodward*; 1 *Bl. Com.* 469, 470, 471, 482; 1
*Kyd. Cor.* 25; 1 *Bur.* 200; *Porter's case,* 1 *Co.* 22, *b.* 23.

Those who contend, that the act of incorporation is not warranted
by the constitution, must place their objections upon the ground that
the local boards by the third, twenty-first, and twenty-second sections
of the charter, possess all the powers and privileges of banking.—
That the central board is by the seventh, eighth, and ninth sections of

LITTLE
ROCK;
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.
the charter, the mere creature of their will, and clothed with certain
enumerated and delegated powers, given for the express purpose of
preserving a common concert of operation, with a view to the credit
and welfare of the several banks. That the enumeration of its par-
ticular powers excludes all general powers not enumerated; and from
its very nature and organization, it is shown to be but a delegation of
the directors of the Principal Bank and the respective Branches,
formed for consultation and advisement. That it is not the mere
words or name used in the incorporating act that creates the corpora-
tion, but it is the power, rights, capacities, and privileges conferred;
and as all these are given by the charter, to the Principal Bank and
Branches, consequently, they are four distinct and independent bank-
ing corporations. The charter often uses the term banks, instead of
a bank, and it expressly declares the manner in which loans shall be
negotiated and made by the Principal Bank and each of the Branches;
and the latter clause of the twenty-first section then adds, " they may
severally sue and be sued, plead and be impleaded, answer and be
answered, in all courts having competent jurisdiction, and to have a
common seal," thus endowing the Principal Bank and each of the
Branches respectively with the properties of personality and immor-
tality, which are of the very essence of a corporation. That these
properties cannot exist at one and the same time in the Real Estate
Bank of the State of Arkansas, considered as one institution, and in
the Principal Bank and the respective Branches, is clearly manifest;
and as the charter has conferred them upon the latter, and withheld
them from the former, it thereby constitutes them so many separate
and independent banks. That this position is not destroyed by denom-
inating these separate banks, " the Real Estate Bank of the State of
Arkansas," or by pledging the faith of the State, to raise capital
stock to bank on, or by dividing the losses and profits after the twenty-
second year of the charter, equally among the stockholders, according
to their respective shares. This, it may be said, is only intended to
facilitate or procure the necessary loans for banking by a common
fund; and for greater security and profit among the respective banks
themselves. It may be contended by those opposed to the bank, that
this is but a pretext under the shadow of names, to endeavor to evade
by indirection, the constitutional prohibition. To give to the charter
any other construction, it may be said, would be to clothe the central
board with arbitrary and despotic power; and therefore, it certainly

never could have been the intention of the legislature to have created any such corporation; and that too, without any affirmative declaration or expression.

It should be borne in mind, that the abuse of a power is a wholly different thing from an unwarranted usurpation of it. The one may be, and often is, agreeable to the letter and spirit of the constitution; the other always is, and of necessity, must be, in derogation of its authority. It must be confessed, that this view of the question is imposing and persuasive; and the court have found no ordinary difficulty in successfully meeting and answering the objection. They are deemed, however, not to be sound or tenable; and such as must yield to a fair and just construction of the charter. It surely cannot be contended that the power given in the constitution to incorporate one banking institution, is restricted or confined to a single point or place. The legislature unquestionably possess all power, not expressly or impliedly prohibited. If they have the power to create a bank, based upon the agricultural interest of the country, they certainly possess all the power that is necessary or requisite to put that bank into successful operation; and to make it administer to the wants, wishes, and convenience of the people. To give them power to incorporate a bank, and to confine its operation or management to a single point or place, would, in effect, be to clothe them with a power, and at the same time, to deny them all the essential and requisite means that would make the exercise of that power beneficial or useful. To suppose such a state of case, involves a manifest inconsistency, and such as no legal tribunal will ever countenance or allow.

The legislature, then, has the power to establish one banking institution with any number of agencies or offices of discount and deposit to transact its business; and they may locate these offices or agencies at as many points or places as they may deem advisable or proper.— The only question, then, is, have they done so? The idea of a bank does not presuppose that it shall be kept at one house or confined to one place; but that it shall be one entire corporation, represented by as many integral or constituent parts as may be considered necessary for the transaction of its business. These parts must, however, be inferior or subordinate, and they must be under the control and direction of a superior or governing head. The legislature may vest the governing power of the corporation in a select body of magistracy, chosen from among the stockholders, or from any other class, provided

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

jj

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS

they make but one corporate body. . In the case now before us, the first section of the charter declares, "that there shall be a bank under the name and title of the *Real Estate Bank of the State of Arkansas*, with an original cash capital of two millions of dollars to be raised by loans or negotiations on the security of real property at cash valuation, with the guarantee of the public faith and credit of the State, and that the institution shall consist of a Principal Bank and three Branches. The second section locates the different offices, and divides the capital stock equally between these offices. The twenty-first section creates the subscribers to the capital stock a corporation and body politic for the term of twenty-five years, *under the name of the Real Estate Bank of Arkansas*, and makes them capable of receiving and holding all kinds of property, and of granting, selling, and alienating the same; and empowers them to loan, negotiate, to take mortgages, and to discount on such terms and securities as they may judge proper. Here, then, is an express legislative declaration that there shall be one bank *under the style and name of the Real Estate Bank of the State of Arkansas*, and that the institution shall consist of the Principal Bank and three Branches, which are nothing more than so many integral parts or offices or agencies of discount belonging to the corporation. The subscribers to the capital stock compose the corporation; and it is the Real Estate Bank of the State of Arkansas that is endowed with all the essential and important properties of a corporation or a body politic; and it is the institution thus established, and not the Principal Bank and Branches, as they are called, that has the right to exercise all the powers and franchises of banking, and to do and perform every act that is necessary to continue its corporate existence. The faith and credit of the State is pledged to the Real Estate Bank, by the tenth section of the charter, and not to the Principal Bank or Branches.

This shows that the legislature only contemplated the establishment of one such banking institution. The form of the bonds is prescribed by the charter: they are made payable to the order of the Real Estate Bank, and assigned by the endorsement of the President and Cashier of that institution. The mortgages for the security of the stock, and for the final payment of the State bonds, are directed to be executed to the Real Estate Bank by the thirteenth section of the charter, and all their notes and liabilities are also directed to be issued and created in the same way. By the thirty-seventh section of the

charter, the losses and profits of the institution are equally divided among the entire stockholders according to their respective shares, after first paying all the liabilities of the corporation. These enacting clauses clearly indicate, that it was the design and object of the legis- lature to create and establish but one banking institution. For the act creates and calls it a unity, and preserves that feature through the entire charter, by means of the central board of direction.

That part of the twenty-first section of. the charter, which declares that the Principal Bank and Branches, " may severally sue and be sued, plead and be impleaded, answer and be answered, in all courts having a competent jurisdiction, and to have a common seal, and the same to alter and renew at pleasure," must be considered wholly inoperative and void, as it is directly and positively opposed to the incorporating clause in the same section, and to the general objects and design of the charter. The powers and rights that are attempted to be confer- red by this clause upon the Principal Bank and Branches, belong necessarily to the corporation itself, for if there is but one corporation, it alone is capable of exercising these important franchises, as necessary incidents of its power. They are possessed in as full a manner, and in as ample a degree, without being expressly granted, as if they had been directly conferred by the charter; for they are of the nature and essence of the corporation itself, and cannot be separated from it.— This view of the subject is strengthened and confirmed by compar- ing and analyzing the respective powers of the local and central boards of direction. The third section of the charter, in assigning to the local boards the business severally belonging to each respective office, so far as relates to signing and emitting of notes, the extent of loans to be made, the purchasing of exchange, and the deposite and direction of funds, contains express limitations on their authority, and declares, " that the rights and franchises conferred shall not be so con- strued as to extend powers and privileges beyond the control of the central board of directors."

The twenty-second section in conferring upon the several boards the power to make by-laws and regulations for the administration of the institution entrusted to them respectively, expressly prohibits them from making any ordinance or regulation contrary to the rules or by- laws of the central board. Here, then, are two express declarations of the charter, limiting the power of the several offices to the action of the central board; and declaring that in no instance shall their

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

powers and privileges be extended beyond its control. The charter, then, clearly intended to make the local boards subordinate to the central board, and give to the latter the governing power of the institution. Besides the powers already enumerated, the local boards possess the right to elect their own officers, to constitute the central board, to appoint the commissioners to appraise the property of persons who apply for stock or loans, and to judge of the sufficiency of all mortgages offered for such stock or loans. This enumeration of their rights, constitutes by far the greater share of their power, if not the entire sum. The enumeration and specification of the whole mass of powers belonging to the central board, show that they are of the most important character, and that upon their due exercise mainly depends the existence of the corporation. It is unlimited, except so far as it is restrained in a few particulars by the charter, and by the laws of the land. It cannot create an additional office of discount and deposite, nor can it abolish any one of those already established, when after the first year of their organization and operation, they declare a dividend of six per cent. per annum, upon the capital invested. Nor can it deprive a stockholder of the right of voting for the entire directory of the whole institution, nor a director who shall have received a majority of all the votes so given, of being declared duly elected. These are the principal restraints imposed by the charter, and of course, they are obligatory and conclusive on those points. The seventh section directs the manner in which the Bank shall be organized:—
" when it shall appear that eleven thousand two hundred and fifty shares of the capital stock have been subscribed, and that all mortgages intended to secure the subscription, have been perfected to the satisfaction of the managers," then it makes it the duty of the managers, "to cause a notice of the same to be given in all the newspapers published in the State; whereupon the stockholders are required to proceed, at the place appointed for the location of the Principal Bank and each of its Branches, to elect a board of directors to consist of seven members for each office, and the Governor shall appoint two members on the part of the State, to each of those respective boards, from among the stockholders. The boards thus formed, shall continue in office for the term of one year, and the directors so elected shall immediately thereafter elect one of said directors to be president of each respective branch, except the directors of the Principal Bank." The eighth section declares, "That upon the election and

organization of the boards of directors of the several branches, as provided for in the seventh section of this act, each of them shall select two of their members, (one being a State director,) who, with the president of said bank, and three members of the Principal Bank, shall become members of, and form the central board of directors." The bank must be organized agreeably to these provisions of the charter, and the principles therein contained. The number of the respective boards can neither be diminished or enlarged, beyond the provisions of the charter. In the first organization and formation of the several boards of direction, and in their subsequent continuance and election, their number can neither be in any manner altered, varied, or changed from the one fixed and specified in the charter.— For if they could, the local and central boards of direction would be deranged and disorganized; and made to consist of a number wholly different from that established by the act of incorporation, which would be clearly, not only irregular, but illegal.

The respective boards must, therefore, by the election of directors, be made to conform to the number expressed in the charter. The stockholders, in proceeding to organize the corporation, had unquestionably the right to vote for the whole directory of the Principal Bank and each of the Branches. This right was, however, a personal privilege, which might be waived at pleasure, according to the discretion of each individual stockholder. In voting at the time appointed by the managers, and at the places prescribed in the charter, the stockholders were not necessarily compelled to vote for the entire directors of the whole corporation; but they might make their election to waive their privilege, and only vote for the directors of each respective local board; and such an exercise of the right of suffrage in organizing the bank, would not be inconsistent or incompatible with the charter; provided all the other essential and indispensable requisites were complied with. The ninth section defines the power, and prescribes the duties of the central board, and makes it consist of twelve members, chosen from the Principal Bank and Branches. It declares "that it shall be the duty of the central board, immediately after their appointment, to meet at the city of Little Rock, and elect from among themselves, a president of said board, who shall be president of the Principal Bank, and hold his office for a term not less than four years. It is made their duty to apply for, and receive from the managers, all the books, the papers, and mortgages, belonging to the

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

bank, and also from the Governor, the bonds of the State, and to appoint two commissioners to negotiate the sale of them, provided the same can be sold for par value. They are required to meet at the banking house of the Principal Bank, on the first Mondays in May and November, in each year; and in case of the absence of the President, they shall elect a President *pro tempore*, and the cashier of the Principal Bank shall be secretary of the board, and it shall be his duty to keep a regular account of all its acts and proceedings. This section further declares, "that the central board shall possess a revising and controlling power over all the acts and proceedings of the Principal Bank and Branches, so far as may seem necessary and proper, for preserving a common concert of operation, with the view to the credit and welfare of the several banks. It shall assign and transfer any excesses of subscription for stock, made at the Principal Bank or any of its Branches, to the office where there is a deficiency of subscription, and the stock not taken. It shall lessen or withdraw the capital of any of the offices of said bank, where the same cannot be employed to profit and advantage, and where, after the first year, a dividend of six per cent. per annum cannot be divided, and transfer the same to such bank, branch, or branches, as are deficient and in want of capital.— It shall attend to the payment of the interest, as it becomes due, on the State bonds, and all loans negotiated. It shall ascertain and strike the dividends of the profits, as well for the Principal Bank as for the Branches; and attend to the payment of them to the individual stockholders, as hereinafter provided. It shall settle and control all the general accounts of the institution, and, "*finally, it shall exercise such other power for the well governing and ordering the affairs of the said banks, as may be deemed necessary and proper to advance the general interest:* Provided, That the same be not contrary to the provisions of this charter, or the laws of the State." By the twenty-fifth section it is declared, that after the first appointment of directors, the central board shall fix upon the time for holding the future elections, as well for the Branches as the Principal Bank, and the directors of said Principal Bank and Branches, shall be elected by the stockholders or their attorneys, after public notice shall be given in all the newspapers published at the city of Little Rock, and such other newspapers as are published at the several places where the Branches of said Bank are located, at least thirty days previous to such elections, "*thereby appointing the time and place where the stockholders shall meet for that*

*purpose*," each stockholder being entitled to one vote for each share held by him, not exceeding one hundred; and no person, co-partnership, or firm, shall be entitled to a greater number than one hundred votes. The director who shall receive a majority of the votes so given, shall be declared elected; provided, the stockholder, to be entitled to vote, shall have held his shares three calendar months, previous to such election." The duties herein enjoined, and the powers conferred upon the central board, are of the most general and important character; and it is difficult to conceive how the legislature could have conferred a more widely extended authority. Complete and unlimited control is given to the central board, over the acts and proceedings of the respective offices, in order that the credit and welfare of the Bank may be kept up and preserved. This is done to preserve consistency and uniformity of action throughout the entire operations of the corporation. If the powers here given are not duly and properly exercised by the central board, the institution would speedily fall into the utmost confusion, if not into utter ruin. The central board is required to do much that is important and absolutely necessary, to organize the bank, and after it is put into operation, they are then commanded to perform certain other highly responsible duties, by which alone, its corporate existence can be maintained, and the general objects of the charter promoted. The general interest of the bank is committed to its custody and care, by express grant; and it is invested with complete and plenary power, for the well governing and ordering the affairs of the institution. The central board may be said to represent the unity, sovereignty, and indivisibility of the corporation, by means of its legislative powers; and hence the charter has made it their duty, to declare the dividends of the profits among the stockholders, to pay the interest upon the State bonds, and all loans negotiated, and to settle and control the general accounts of the institution. That this governing power may be respected and obeyed, the central board has express power given to it, by the twenty-first section, to establish by-laws, rules, and ordinances, for the well governing of the affairs of the corporation. Power is given to it, after the bank is organized, to appoint the time and place of holding the future elections, for the stockholders to vote for the directors of the Principal Bank and Branches. The unity of the corporation is thus clearly indicated, and kept up, by the charter, in giving to each stockholder the right to vote for all the directors of the corporation, one vote for each share, provided, the number does not exceed one hundred.

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

In regard to those duties enumerated in the charter, and which are imposed upon the central board, they are bound to perform them, and cannot confide their execution to other hands. It is a delegation of power, and of course cannot be transferred to any other body without a violation of the charter. These duties concern the general interest of the corporation; therefore, the legislature has thought proper to confide them to the central board; and has made it imperative upon that board to exercise them.

The local boards are inferior, subordinate tribunals, possessing limited authority specially delegated to them by the charter; and if they usurp powers conferred upon the central board, or if the central board attempts to delegate to them powers entrusted to itself, such act or acts are void, being repugnant to the charter.

The local boards cannot pass any by-law or ordinance affecting any other part of the corporation than that over which they respectively preside, and even then, their authority is subjected to the control of the central board. It is the central board that constitutes the revising and governing power of the corporation, and forms the bond of union which binds its separate and components parts together, making it *one common whole, and one banking institution.* And if this be the case, then the legislature possessed the power to incorporate such a bank, and its charter is established agreeably to the constitution. In relation to the policy or propriety of the powers and privileges conferred on this corporation, it is neither the duty or intention of the court to express or intimate any opinion. Time and experience can alone solve that problem, and to those unerring and scrutinizing tests, the friends and enemies of the bank, are both equally constrained implicitly to submit their difference of opinion. It must, however, be admitted that the constitutional question is one of difficulty and embarrassment, about which enlightened jurists may differ, and in regard to which human reason may be induced to pause, and human judgment to stand in a state of suspense. And this being the case, according to the doctrine of the Supreme Court of the United States, in the case of *McCulloch* vs. *The State of Maryland,* and of *Osbourn* vs. *The Bank of the United States,* this court is bound to respect the law, and declare the act of the legislature in incorporating the Real Estate Bank, to be constitutional.

The only remaining question to be determined, is, whether the defence set up by the defendant, in his five several pleas, is a good

answer to the writ, or shows a valid warrant for exercising the duties of director of the Principal Bank of the Real Estate Bank of the State of Arkansas. The State is bound to show nothing, for if the office was lawfully granted, the defendant can show his warrant for exercising its duties. He must either disclaim or justify. If he disclaims, then the State must have judgment. If he justifies, he is bound to show his title specially, and all those particulars upon which it is founded. See *Willcock on Mun. Corporations,* 486, 487, 488. In this case the defendant has justified, and has pleaded five several pleas, showing his warrant or title to the office. All of the pleas aver, that he was elected director agreeably to the provisions of the charter, and according to the ordinances and regulations of the local and central boards, made in pursuance of its authority. They plead substantially the same matter in different ways. The defendant relies upon each plea, as showing a good and sufficient warrant. In order to determine this matter correctly, the court must look to those provisions of the charter, and the ordinances and regulations of the central and local boards relating to the subject. The inquiry, then, is, what constitutes a good and sufficient warrant for the election of director of the Principal Bank of the Real Estate Bank of the State of Arkansas?

The law incorporating the bank, is a public act, and therefore the court is bound judicially to take notice of it; consequently, it is not necessary for the defendant, in his pleas, to set out the entire charter of the bank.

There are certain precedent conditions required by the charter to be performed by the subscribers to the capital stock, before they can become stockholders, and hence it is necessary to aver, that the charter was accepted; for without such an allegation, the court cannot be informed of the legal existence of that fact. The defendant must aver, that he is a stockholder; for the charter prohibits any other person from being chosen a member of the board of directors, and, of course, it is indispensably necessary to make such an allegation. The defendant must allege, and set out the ordinance of the central board, fixing the time and place of holding the election for directors, agreeably to the twenty-fifth section of the charter, and he must aver that such election was held, at the time and place, appointed by the notice, prescribed by the central board, and in pursuance of its authority, and that he received a majority of the votes, of all the stockholders, who voted at such election.

KK

LITTLE ROCK.

Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

The whole power in regard to fixing the time and place for holding the future election for directors of the Principal Bank and Branches, is conferred expressly by the charter on the central board; and it is their duty to exercise it: consequently they have no authority to delegate that power to the local boards, or to any part or portion of the corporation, and if they make any such delegation to the directors of the Principal Bank or Branches, such act or acts are null and void; for they are not only wholly unauthorized, but positively prohibited by the charter. And if the local boards assume or usurp any such power in regard to the election of directors, such a proceeding on their part is equally null and void, being repugnant to the charter, and also to the authority of the central board. This being the case, it necessarily re_sults that the election of directors for the Principal Bank and Branches, which has been held under the act of the central board, purporting to authorize the respective boards to appoint commissioners to hold such election, is nugatory and void; for the central board have no power to make such an ordinance upon the local boards, neither have those boards any authority to act under such an ordinance, or to prescribe any rule upon the subject. If the central board should fail to act, or to appoint commissioners to hold the election, or should act not in conformity to, but in disobedience of the charter, then, as there can be no valid election for directors of the Principal Bank and Branches, under such a proceeding, it necessarily follows, that no new central board can be legally appointed or chosen, by those claiming to derive their authority under, or by virtue of such illegal and invalid election. The corporation would not, on that account, be necessarily dissolved; provided, it is otherwise properly organized, according to the provisions of the charter. The former existing central board, if legally constituted, would continue in office, with full power and authority to meet, and to appoint the time and place of holding the future election for directors for the Principal Bank and Branches, and to prescribe the mode and manner of declaring the director, who should receive a majority of the votes of all the stockholders, duly elected. The central board possesses the sole and exclusive power of appointing the *time* and *place* of holding the election for directors of the Principal Bank and Branches, and of prescribing the rule of certifying such election, for the charter expressly confers it, by the twenty-fifth section. This power does not belong to the local boards as an incidental power, for they possess no incidental powers, and it certainly is not conferred by

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

the twenty-second section of the charter, giving authority to the local boards, "to make by-laws and regulations for the administration of the institution entrusted to them respectively." What right or authority have they, then, to make any by-law or regulation, respecting the general interest of the corporation? Is not that interest confided to the central board by express grant, and is it not enjoined upon it as an absolute and positive duty; which it can neither delegate nor fail to execute? Then 'it is not only the right, but the duty of the central board to appoint the *time and place for holding the election for all of the directory, and also to prescribe the mode and manner by which that election shall be legally declared, and duly certified.* Without some such rule or regulation, prescribed or ordained by the central board, the right of suffrage in the stockholders, and the right of being chosen a' director, would be inchoate and incomplete; for these important and necessary franchises could not be exercised and carried into practical operation, unless there was some mode or means devised by the central board for that purpose. In laying down the rule upon the subject, the central board may adopt any regulation, that their discretion may dictate, provided such ordinance or by-law does not impair the right of the director, who receives a majority of the votes of all the stockholders of the corporation offered to be given, to be declared duly elected, or the right of each and every individual stockholder, to vote for all the directory of the Principal Bank, as well as each of the Branches. These rights they can neither touch or impair, in any manner, for they are secured and defined by the charter. It is as much the right of the director, who receives a majority of the votes of all the stockholders, to be declared duly elected, as it is the right of each and every stockholder to vote for all the directors of the Principal Bank and Branches. Whatever rules or regulations the central board may choose to adopt, in relation to this matter, must be in aid and confirmation of those rights, and not in derogation of their authority. The moment its action interferes in such a manner with these rights, as seriously to lessen and embarrass them, such ordinance or regulation becomes null and void, and the courts of justice, upon a case properly made out, would be bound to afford the injured party proper and adequate remedy and redress. The election for directors *must then be held at one and the same time, and at one and the same place, and the time and place must be ordained and appointed by an order of the central board.* agreeably to the directions of the twenty-fifth section of the

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS

charter. The central board must also prescribe the rule, by which the director who receives a majority of the votes of all the stockholders, shall be declared duly elected, and his election properly authenticated.

If these principles be correct, and that they are, the court have no doubt, then it follows that each and all of the defendant's five several pleas, are fatally defective, in not averring and showing such a state of facts, as constitutes a valid or sufficient warrant, for exercising the duties of the office of director of the Principal Bank of the Real Estate Bank of the State of Arkansas. They fail to show that the defendant is a stockholder, and that the election under which he claims to have been chosen a director, was held under, and in pursuance of an ordinance or direction of the central board of directors, *fixing the time when*, and *the place where*, the same should be held, agreeably to the provisions and requisitions of the charter. Nor do they exhibit any notice of said election, given by, and under the authority of the central board, as prescribed by the charter. · The pleas, in not showing these important and indispensable requisites of a good and sufficient warrant, wholly fail to justify the defendant's title to the franchise.

This being the case, it follows as a necessary consequence, that the defendant must be regarded, as having unlawfully entered into, and exercised the office of director in question. He justifies his claim to the franchise, in each and all of his pleas, partly under an ordinance of the central board, purporting to authorize the Principal Bank and Branches to appoint commissioners to hold said election; and partly under a resolution adopted by the directory of the Principal Bank, acting under, and in conformity to, the authority attempted to be given them by the central board; and as both the ordinance and resolution have already been shown to be inconsistent with the charter, they are therefore null and void; consequently, the election of directors of the Principal Bank and Branches, held under such authority and direction, must be equally inoperative, and of no effect, and therefore the demurrer to each of the pleas of the defendant must be sustained.

*Note.*—It is above decided, that it was necessary for the defendants to state in their pleas that the charter of incorporation had been accepted by the stockholders.

I would suggest with great deference, that the Supreme Court of New York, in the case of *The People* vs. *Saratoga and Rensselaer Rail Road Co.* 15 *Wend.* 125, have decided that such an averment is unnecessary; upon the strength of *People* vs. *Niagara Bank*, 6 *Cow.* 196; *Bank of Auburn.* vs. *Aikin*, 18 *J. R.* 137; *Wood* vs. *Jefferson Co. Bank*, 9 *Cow.* 194; *Utica Ins. Co.* vs. *Tillman*, 1 *Wend.* 555.—[*Rep.*